# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | CV 19-9263-GW-RAOx | Date | January 21, 2021 |
| Title | *Dennis Culver v. Unilever United States, Inc.* | | |

| | |
|---|---|
| Present: The Honorable | GEORGE H. WU, UNITED STATES DISTRICT JUDGE |

| Javier Gonzalez | Terri A. Hourigan | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Benjamin Heikali | Claudia M. Vetesi |
| | Spencer S. McManus |

**PROCEEDINGS:**   **TELEPHONIC HEARING ON DEFENDANT UNILEVER UNITED STATES, INC.'S MOTION TO DISMISS THE COMPLAINT [16]**

Court hears oral argument. The Court's Final Ruling is attached hereto. Defendant's Motion is GRANTED with leave to amend. Plaintiff will have until March 9, 2021 to file a First Amended Complaint and an offer of proof as to the survey discussed on the record. Defendant will have until April 6, 2021 to file its motion to dismiss. Plaintiff's opposition is due on or before April 30, 2021. Defendant's reply, if any, is to be filed by May 12, 2021. A hearing on the motion is set for May 24, 2021 at 8:30 a.m.

| | : | 30 |
|---|---|---|
| Initials of Preparer | JG | |

*Dennis Culver v. Unilever United States, Inc.*; Case No. 2:19-cv-09263-GW-(RAOx)
Final Rulings on: (1) Motion to Dismiss and (2) Motion to Strike or Alternatively be Given
Leave to File a Sur-Reply

## I.  Introduction[1]

Plaintiff Dennis Culver ("Culver") brought this putative class action against defendant Unilever United States, Inc. ("Unilever"), based upon purportedly deceptive business practices with respect to its Maille brand of mustard products.  Before the Court are Unilever's Motion to Dismiss the complaint for failure to state a claim ("Motion") and Culver's motion to strike portions of Unilever's Reply, or alternatively for leave to file a sur-reply.  For the reasons stated herein, the Court **GRANTS** Unilever's Motion, and **DENIES** Culver's motion to strike portions of Unilever's Reply.

## II.  Background − Plaintiff's Claims and Defendant's Responses

Unilever is a corporation organized under Delaware law with its principal place of business in New Jersey.  *See* Compl. ¶¶ 23-24.  The Complaint alleges that Unilever's marketing and labelling of its Maille brand mustard products mislead consumers into believing that the products are manufactured in France, when they are in fact manufactured in Canada.  *Id.* ¶¶ 1-2.

As delineated in the Complaint, the Maille brand traces its origins to France in the 1700s. *Id.* ¶ 26.  In 1747, Antoine-Claude Maille opened his first boutique in Paris, selling a range of aromatic mustards.  *Id.* ¶ 27.  That year, he became the official supplier of mustard to King Louis XV.  *Id.*  Over the next 250 years, the Maille brand expanded.  For example, a Maille boutique was opened in Dijon, France in 1846 and that boutique is still in operation today.[2]  *Id.* ¶¶ 28-29.

Culver avers that he is bringing the present action as to Unilever's "deceptive business practices with respect to the sale of its 'Maille' brand mustard products that, even though appear to be made in France, are not from France (collectively, the 'Products')."  *Id.* ¶ 1.  The Complaint seems to be including all of Unilever's Maille brand mustard varieties sold in California within

---

[1] The following abbreviations are used for the parties' filings: (1) Culver's Class Action Complaint ("Compl."), ECF No. 1; (2) Unilever's Motion to Dismiss ("Mot."), ECF No. 16; (3) Culver's Opposition to Unilever's Motion to Dismiss ("Opp."), ECF No. 17; (4) Unilever's Reply in support of its Motion to Dismiss ("Reply"), ECF No. 18; (5) Culver's Motion to Strike ("MTS"), ECF No. 19.

[2] The Complaint fails to allege any connection between the Maille mustards originally manufactured and sold in France and Unilever's sales activities in the United States.  However, in its Motion, Unilever included the Declaration of Benjamin Crook (the "Director for Dressings & Condiments at Unilever United States, Inc.") who states that "[t]he Unilever family of companies acquired the Maille brand in 1999."  *See* ECF No. 16-1.

the lawsuit because, *inter alia*, it refers to "'Maille' brand mustard products" as "collectively, the 'Products'." *See, e.g.* Compl. at ¶ 1 ("Plaintiff brings this consumer protection and false advertising class action lawsuit against Defendant, based on Defendant's deceptive business practices with respect to the sale of its 'Maille' brand mustard . . . ."); at ¶ 2 ("At all relevant times, Unilever has systematically marketed and sold the 'Maille' brand mustard Products with labeling, packaging, and advertising that indicate the Products are made in France . . . ."); at ¶ 3 ("Each of the Product labels bear references to France and makes use of the French language").  Further, the particular elements of the Products' front labels (which Culver claims are misleading) are more or less common to all of Unilever's Maille mustard containers.  In the Complaint, Culver identifies two specific Maille mustard products that he purchased, *i.e.* Maille Old Style Mustard ("Old Style") and the Maille Dijon Originale Traditional Dijon Mustard ("Traditional Dijon") (henceforth, collectively, "Purchased Mustard Products").[3]  *Id.* ¶ 15.  But the Complaint does not specifically limit the scope of the class to just the Purchased Mustard Products.  Indeed, that deficiency was pointed out in Unilever's Motion to Dismiss: "Plaintiff does not identify which of the five mustard varieties in the Maille line is subject to his suit."  *See* Mot. at 1.  However, in footnote 1 to his Opposition to the Motion, Culver now states that: "The 'Products' at issue are Maille Old Style Mustard and Maille Traditional Dijon Originale."  *See* Opp. at 1.

Culver alleges that the "labeling and marketing of the Products . . . contained references to Paris and France and made use of the French language."  *Id.* ¶ 17.  In particular, Culver references only the following specific items on the Products' front labels which he alleges "[t]aken in isolation and in the various combinations in which they are used on the labeling . . . create a misleading perception that the Products are made in France:

    a.  the word 'Paris' and/or a French address (or addresses)[⁴];

    b.  a Paris emblem;

    c.  the words 'Depuis 1747'; and

---

[3] Henceforth as used herein, "Products" will refer to all of the Maille brand mustards which Unilever sells in California, whereas "Purchased Mustard Products" will refer collectively to the Old Style and Traditional Dijon mustards which Culver actually purchased.  Culver only identifies two varieties of Maille mustards products and Unilever in its initial Request for Judicial Notice presents three additional ones – but there may be even more Maille mustard products than have been cited to by the parties thus far (*see* footnote 13, *infra*).

[4] It is observed that in none of the front labels of the Products − as depicted in the Complaint or in Unilever's initial Request for Judicial Notice (which the Court grants − *see* footnote 10, *infra*) − is there any address depicted or referenced.

d.   the words 'Que Maille'."

*Id.* ¶ 36.  The following is the image of the front label on the Traditional Dijon Mustard provided in the Complaint:



*Id.* ¶ 37.

To support his allegations that the packaging and labeling are misleading, Culver in the Complaint refers to the results of a "recent, independently conducted online survey by a market research company" ("Survey") that purportedly involved a "demographically representative sample of over 400 U.S. consumers who purchased mustard products prior to the Survey." *Id.* ¶¶ 6, 41, *but see* footnote 30, *infra*, which questions that claim.  After being shown the "principal display panel"[5] of the Maille Traditional Dijon mustard bottle, respondents were asked "Based on the label of the product, where do you believe the product is made?" and given a drop down list of 21 countries (including France, Canada, and the United States) as well as options to select "None

---

[5] The Complaint does not define what "principal display panel" refers to.  In its Reply, Unilever included a Supplemental Request for Judicial Notice which provided a copy of the purported Survey that is referenced in paragraphs 6 and 41 of the Complaint.  *See* ECF No. 18-1.  The Survey only showed the respondents the front label (and not the top of the container or the rear label).  *Id.*  The image appears to be exactly the same as the one depicted in paragraph 37 of the Complaint (and depicted above).

of the above" or "I am not sure."  *Id.*  63% of respondents selected France.  *Id.*  Culver avers that the Survey "confirmed that consumers are being deceived."  *Id.*

Culver also alleges upon information and belief that Unilever provided the following product description that was used on Walmart's online product page for the Maille Traditional Dijon Mustard:

> Maille Dijon Originale Traditional Dijon Mustard goes brilliantly with all types of food – meat, fish, cooked or raw vegetables – and is a welcome addition to dressings and sauces.  260 years of mustard-making expertise stand behind the finesse and flavor of this outstanding mustard.  Maille is the #1 brand of imported mustard in the U.S.  It is the largest brand of mustard, vinegar and cornichons in France.

*Id.* ¶ 38 (citing *Maille Dijon Originale Traditional Dijon Mustard*, 7.5oz., WWW.WALMART.COM, http://bit.ly/2VhP3yx (last visited Jan. 8, 2021)).  Culver does not claim that he himself ever saw the referenced Walmart online product page before he made his purchases.  Nor does he aver that any portion of the Walmart Description is, in fact, false.

Culver, a California citizen and resident, made his purchases in 2018 and 2019 from a few locations in California.[6]  He alleges that Unilever's packaging and labeling causes confusion among consumers who believe they are purchasing a product manufactured in France, not Canada.  Compl. ¶ 44.  It is averred that "the Products were sold across California and the United States at a premium price above North American produced mustards."[7]  *Id.* ¶ 32.  According to Culver, consumers are willing to pay a premium price for mustard manufactured in France.  *Id.* ¶ 46.  Culver asserts that he and the proposed class members would not have bought Unilever's Maille Products at all[8] or at least would not have paid as high a premium for the Products if they had known that they were not manufactured in France.[9]  *Id.*

---

[6]  He only identifies three stores where he bought the Purchased Mustard Products, *i.e.* "Costco in Oxnard, California; Costco in Goleta, California; and Albertsons in Carpinteria, California."  *Id.* ¶ 15.

[7]  In referring to "Products" in the Complaint, Culver does not differentiate between the Maille brand mustards which are made in France and those which are made in Canada.  Further, he does not define what he means by "premium price" – *e.g.* does he mean that all of Unilever Maille brand mustards are sold in California at a price above all other mustards which are produced in North America (or in any other country other than France).

[8]  The Complaint appears to assume without any articulated foundation that all purchasers of Maille mustard varieties in California (where the proposed class action is based) are seriously concerned as to the country of origin of the product.

[9]  Although Culver alleges that class members would not have paid as high a price for the Products had they known that the Products were not made in France, he assumes a fact not in evidence and hence does not allege any proper basis for that assertion.  For example, he does not aver that the typical price charged for an American made mustard (*e.g.* Grey Poupon County Dijon Mustard) would be lower than for the comparable Maille product (*e.g.* Maille Old

The Complaint raises the following causes of action: (1) violation of California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750 *et seq*; (2) violation of California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500 *et seq*; (3) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq*; and (4) breach of quasi-contract/unjust enrichment/restitution under California law. Compl. ¶¶ 65-113. The proposed class consists of "[a]ll California consumers who purchased one or more of the Products primarily for personal, family, or household purposes during the period from April 4, 2015, to the date of class certification." Compl. ¶ 45. Culver seeks statutory and monetary damages as well as injunctive relief. *See* Prayer for Relief, Compl. at 21.

In its Motion, Unilever raises the following contentions. *See* Mot. at 1-2. First, it argues that Culver's claims do not meet Federal Rule of Civil Procedure 8(b)'s plausibility threshold – *i.e.* a reasonable consumer would not be mislead by the packaging or labels into believing that the Products are manufactured in France; and, in any event, all of the rear labels in its Maille mustard line carry a clear identification of the country of origin, *e.g.* "Product of France" or "Product of Canada." Hence, any consumer who had a question as to the country of origin of the Product would instantly have the answer with a look at the rear label. The following representative rear label for the Old Style mustard product was provided in the Motion:



Style Mustard) at a typical retail grocery venue (*e.g.* Walmart). *Cf., Shalikar v. Asahi Beer, U.S.A., Inc.*, No. CV-17–02713-JAK-(JPRx), 2017 WL 9362139, at *3 (C.D. Cal. Oct. 16, 2017) (it was alleged that the defendant's beer was sold at a premium price of $9.99/six-pack whereas the price of domestic beers was $6.99/six-pack.). As observed in *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009), "[i]t is the conclusory nature of respondent's allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth."

*Id.* at 7.  Second, Culver's claims are based in fraud but are not pled with the particularity required by Fed. R. Civ. P. 9(b).  *Id.* at 1.  Third, Plaintiff lacks standing with respect to those parts of his claims that involve products he did not purchase or statements he did not see; nor can he seek injunctive relief.  *Id.*  Fourth, Unilever argues that Culver's claims are preempted by federal regulations promulgated by the Food and Drug Administration.  *Id.*  Finally, Culver's claim for breach of quasi-contract is duplicative of his other claims and should be dismissed.  *Id.*

Included within the Motion is a Request for Judicial Notice of the front and rear labels for the following Maille mustard products: (1) the 2018 label for Maille Rich Country Mustard, (2) the 2018 label for Maille Honey Dijon Mustard, (3) the 2018 label for Maille Horseradish Mustard, (4) the 2017 and 2018 labels for Maille Old Style Mustard, and (5) the 2014, 2017 and 2019 labels for Maille Dijon Originale Traditional Dijon Mustard.[10]  *See* ECF No. 16-3.  The rear labels for the Maille Rich Country Mustard, the Maille Honey Dijon Mustard, and Maille Horseradish Mustard (henceforth "Maille Made-in-France Mustards") all state that they are a "Product of France;" while the rear labels for Maille Old Style Mustard and Maille Dijon Originale Traditional Dijon Mustard (*i.e.* the Purchased Mustard Products) state that they are a "Product of Canada."  *Id.*  The only addresses included in any of the Products are placed on the rear labels.  With one exception, the only address provided is "Distributed by: © Unilever, Englewood Cliffs, NJ 07632" (the "Englewood Address").  The one exception is on the rear label of the 2017 version of the Maille Dijon Originale Traditional Dijon Mustard which states (next to a "Product of Canada" notice): "Manufactured for: Amora Maille SI, ZI De La Norge, Chevigny Saint-Sauveur, 21800, Quetigny, France."[11]  *See* Exh. H, ECF No. 16-3.

In its Reply, Unilever included a supplemental request for the Court to take judicial notice of the Survey that was referenced in the Complaint.  *See* ECF No. 18-1.  Culver objected and

---

[10] In his Opposition to the Motion, Culver did not object to Unilever's initial Request for Judicial Notice and, in fact, he referenced some of the documents contained therein in his Opposition.  *See, e.g.,* Opp. at 24.  Hence, the Court grants Defendant's initial Request for Judicial Notice.  *See Przybylak v. Bissell Better Life LLC,* No. CV 19-2038-PA-(GJSx), 2019 WL 8060076, at *4 n.2 (C.D. Cal. 07/19/2019) (defendant's request for judicial notice of product labels was granted because: (1) plaintiffs did not object to said request, (2) the authenticity of the labels was not disputed, and (3) the complaint extensively discussed and relied upon the defendant's product labels); *accord, Bowring v. Sapporo U.S.A., Inc.,* 234 F.Supp.3d 386, 389 (E.D. N.Y. 2017); *see also Knievel v. ESPN,* 393 F.3d 1068, 1076 (9th Cir. 2005) (court's may take judicial notice of documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the plaintiff's pleading.).

[11] It is noted that the 2014 and 2019 versions of the Traditional Dijon Mustard rear labels only had the Englewood Address.  *See* Exhibits G and I, ECF No. 16-3.

moved to strike that request − *not* because the attached document was not, in fact, the Survey that was referenced in the Complaint and discussed by Plaintiff on pages 1, 3, 5-6, 14 and 23 of his Opposition – but rather because Unilever had not mentioned the Survey in its initial motion papers. Culver further contends that if the Court does grant judicial notice of that document, he should be given leave to file a sur-reply.

## III. Legal Framework

### A. Rule 12(b)(6)

A complaint may be dismissed for failure to state a claim for one of two reasons: (1) lack of a cognizable legal theory; or (2) insufficient facts under a cognizable legal theory. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); see also *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008) ("Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory."). The court must construe the complaint in the light most favorable to the plaintiff, accept all allegations of material fact as true, and draw all reasonable inferences from well-pleaded factual allegations. *Gompper v. VISX, Inc.*, 298 F.3d 893, 896 (9th Cir. 2002). The court is not required to accept as true legal conclusions couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Where a plaintiff facing a 12(b)(6) motion has pled "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," the motion should be denied. *Id.*; *Sylvia Landfield Trust v. City of Los Angeles*, 729 F.3d 1189, 1191 (9th Cir. 2013). But if "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not show[n] . . . the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (citations omitted). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

### B. Consideration of Plaintiff's Consumer Protection Claims

Culver's claims under California's consumer protection statutes (the CLRA, FAL, and UCL) are governed by the "reasonable consumer" test: a plaintiff must show "members of the public are likely to be deceived." *Ebner v. Fresh, Inc.*, 838 F.3d 958, 965 (9th Cir. 2016) (citing *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008)). "[T]hese laws prohibit not only advertising which is false, but also advertising which, although true, is either actually misleading or which has the capacity, likelihood or tendency to deceive or confuse the public."

*Leoni v. State Bar*, 39 Cal. 3d 609, 626 (1985).  However, the test requires more than "a mere possibility" that the labels "might conceivably be misunderstood by some few consumers viewing it in an unreasonable manner."  *Ebner*, 552 F.3d at 965 (quoting *Lavie v. Proctor & Gamble Co.*, 105 Cal. App. 4th 496, 508 (2003)).  Rather, a plaintiff must show a probability that "a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled."  *Id.* (quoting *Lavie*, 105 Cal. 4th at 508).

It has been noted by some courts that, except in rare circumstances, the question of "whether the packaging as a whole was deceptive is a question of fact that cannot be resolved on a motion to dismiss."  *See, e.g., Zakaria v. Gerber Products Co.*, No. 15–200–JAK, 2015 WL 3827654, at *8 (C.D. Cal. 2015) (citing *Williams*, 552 F.3d. 934).  This Court is mindful of the Ninth Circuit's general rule that "whether a business practice is deceptive will *usually* be a question of fact not appropriate for decision on demurrer.  [Emphasis added]."  *Williams*, 552 F.3d at 938-39 ("The facts of this case . . . do not amount to the *rare* situation in which granting a motion to dismiss is appropriate. [Emphasis added]").  However, "usually" and "rare" do not connote "never"[12] and there has been an ever-increasing number of cases (even at the Ninth Circuit) in which a motion to dismiss was found to be appropriately granted where the issue was whether a product label is (or would be) deceptive or misleading to a reasonable consumer.  *See, e.g., Becerra v. Dr. Pepper/Seven Up, Inc.,* 945 F.3d 1225, 1228-31 (9th Cir. 2019); *Ebner*, 838 F.3d at 965-66; *Clark v. Westbrae Natural, Inc.*, No. 20-cv-03221-JSC, 2020 WL 7043879, at *3-4 (N.D. Cal. Dec. 1, 2020); *Cheslow v. Ghirardelli Chocolate Co.,* 445 F.Supp.3d 8, 16 (N.D. Cal. 2020); *Hill v. Roll Int'l Corp.*, 195 Cal. App. 4th 1295, 1300-01 (2011).

## IV.  Discussion

### A.  Obvious Problem with the Class Action as Currently Pled

Culver  seeks  to  bring  a  class  action  consisting  of  "[a]ll  California  consumers  who

---

[12] As observed in *Hill v. Roll Int'l Corp.*, 195 Cal. App. 4th 1295, 1300-01 (2011):

"[t]he standard to be used in evaluating whether an advertisement is deceptive under the UCL is purely a question of law…." (*Lavie v. Procter & Gamble Co*. (2003) 105 Cal.App.4th 496, 503 [129 Cal.Rptr.2d 486].)  Other courts have stated that whether a business practice is fraudulent, deceptive, or unfair is generally a question of fact requiring the consideration and weighing of evidence, and usually cannot be decided on demurrer.  (*Linear Technology Corp. v. Applied Materials, Inc.* (2007) 152 Cal.App.4th 115, 134–135; *McKell v. Washington Mutual, Inc.* (2006) 142 Cal.App.4th 1457, 1472; *Williams v. Gerber Products Co.* (9th Cir. 2008) 552 F.3d 934, 938–939.)  This is not an irreconcilable conflict: generally and usually do not mean invariably, and a demurrer must be sustained when the assumed facts show lack of a valid claim.

purchased one or more of the Products primarily for personal, family, or household purposes during the period from April 4, 2015, to the date of class certification."  *See* Compl. ¶ 45.  The Complaint fails to include a definition of the word "Products."  Culver asserts that Unilever's Maille mustard labels are misleading because they cause a reasonable consumer to believe that the Maille brand mustard that they purchased was made in France when, in fact, they were manufactured in Canada.  Even assuming *arguendo* that his contention as to the misleading nature of the labels is correct (which as discussed below, it is apparently not), the Complaint would nevertheless have to be amended because, at a minimum, it is unclear as to whether the class action is meant to cover only the Purchased Mustard Products (*i.e.* the Traditional Dijon and Old Style mustards), whether it also includes the Maille Made-in-France Mustards (*i.e.* the Horseradish, Honey Dijon and Rich Country Dijon mustards) not cited in the Complaint but referenced by Unilever in its Motion, or whether it contains all varieties of Maille mustards available to California consumers.[13]  Additionally, after taking judicial notice of the labels of the Maille mustard products referenced so far in this litigation, it appears that only a minority of Unilever's Maille mustard varieties are made in Canada, with the majority of them being manufactured in France.[14]  *See* page 5, *supra*.

While Culver in his Opposition now indicates that he is limiting the scope of his class action to just the Purchased Mustard Products, the Complaint does not contain that limitation and, in fact, suggests no such restriction.  *See, e.g.*, Comp. ¶ 1.  Thus, the Complaint fails to satisfy Fed. R. Civ. P. 9(b)'s requirement that the plaintiff must "state with particularity the circumstances" constituting the misrepresentation.

Therefore, the current Complaint would be dismissed with leave to amend to remedy that problem.

B.  <u>Whether Culver Has Stated a Plausible Claim</u>

1)  *Place of Origin and Labels*

It is *possible* that where a mustard product is made could have an effect on the purchasing

---

[13] The Court would take judicial notice of the fact that when one goes to the Amazon.com website and enters the search term "Maille mustards," the result includes further varieties of Maille mustard products (*e.g.* Wholegrain Mustard and 1747 Fine de Dijon).  *See* https://www.amazon.com/s?k=maille+mustards&ref=nb_sb_noss_1 (last visited Jan. 8, 2021).

[14] There are no allegations or other evidence provided in the Complaint or in the judicially-noticed materials that give the comparative sales figures for the various varieties of Maille mustards condiments.

decision of a particular consumer.  As stated in *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310 (2011):

> To some consumers, processes and places of origin matter. (*See* Kysar, *Preferences for Processes: The Process/Product Distinction and the Regulation of Consumer Choice* (2004) 118 Harv. L.Rev. 525, 529 ["[C]onsumer preferences may be heavily influenced by information regarding the manner in which goods are produced."]; *ibid.* [Although the circumstances of production "generally do not bear on the functioning, performance, or safety of the product, they nevertheless can, and often do, influence the willingness of consumers to purchase the product."].)  Whether a particular food is kosher or halal may be of enormous consequence to an observant Jew or Muslim. Whether a wine is from a particular locale may matter to the oenophile who values subtle regional differences.

*Id.* at 328.

The California Supreme Court in *Kwikset* also observed that: "Simply stated: labels matter. The marketing industry is based on the premise that labels matter − that consumers will choose one product over another similar product based on its label and various tangible and intangible qualities they may come to associate with a particular source."  *Id.*  In that regard, this Court takes judicial notice that in 2013 Unilever filed and in 2016 received a trademark registration from the U.S. Patent and Trademark Office ("USPTO") − *i.e.* U.S. Trademark Serial # 86128622; Registration # 4998641 − for "Maille Que," "Maille Que Maille," and the emblem:[15]



*See*  http://tmsearch.uspto.gov/bin/showfield?f=doc&state=4803:l1axg2.2.4  (last visited Jan. 8, 2021; note − the USPTO Trademark Electronic Search System is updated daily).[16]  Likewise, Unilever N.V. Corp. Netherlands is the owner of the word mark "Maille 1747 QueMaille."  *See*

---

[15] An extremely close inspection of the emblem reveals that it contains the words "que Maille qui m'aille."  A rough translation of the phrase would be (using Google Translate): "that Maille that suits me."  It is questionable whether a consumer would be able to read the words in the emblem without a magnifying glass.

[16] Because USPTO trademark registrations are matters of public record, a court can take judicial notice of them pursuant to Fed. R. Evid. 201.  *See Hesse, et al., v. Godiva Chocolatier, Inc.*, 463 F.Supp.3d 453, 462-63 (S.D.N.Y. 2020).

http://tmsearch.uspto.gov/bin/showfield?f=doc&state=4808:j09y9i.5.7 (last visited Jan. 8, 2021).

While it is possible that some consumers of mustards might want to purchase only mustards actually made in France, the Complaint fails to contain allegations which establish that fact or the extent to which purchasers of Maille mustard products would fall within the category. The failure to provide such averments is problematic herein. For example, in *Brod v. Sioux Honey Ass'n*, 927 F.Supp.2d 811 (N.D. Cal. 2013), a class action was brought for failure of the defendant to include on the label of its honey product notice that all of the naturally occurring pollen had been removed from the commodity. The court observed that while a "particularly sophisticated consumer might consider pollen to be a valuable component of honey, such that the non-disclosure of its removal from Sue Bee Honey would likely result in deception to him or her . . . . [that would] not establish that the *reasonable* consumer would expect honey to contain pollen." *Id.* at 828-29 (emphasis in original). The court went on to find that:

> Plaintiff's complaint is silent on this point with the exception of certain threadbare conclusory recitals that "Plaintiff and members of the Class would not have purchased the Sue Bee Honey" had they known that it was "filtered or pollen-free." . . . "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," however, "do not suffice" to state a plausible claim. *Ashcroft v. Iqbal*, 556 U.S. at 678. No such plausible claim about the expectation of a reasonable consumer is stated here.

*Id.* Culver's allegations herein are similarly threadbare and conclusory. *See, e.g.,* Compl. ¶¶ 9, 19-22. Hence, Culver has not adequately alleged a plausible claim in this regard.

> 2) *Are the Products' Labels Deceptive as to Place of Origin?*

In light of this Court's ruling that the Complaint must be amended to clarify the scope of the Maille Products which Culver is seeking to litigate in this class action, henceforth the Court will only consider whether the labels on Unilever's Maille Traditional Dijon and Old Style mustard products (*i.e.* the Purchased Mustard Products which state on their rear labels that they are a "Product of Canada") are deceptive as alleged in the Complaint.[17]

> a. Packaging and the Front/Rear Label Consideration

The primary evidence as to whether a product's packaging is false or deceptive is the

---

[17] The other three varieties of Maille mustards purportedly sold in California (*i.e.* Horseradish Dijon, Honey Dijon, and Rich Country Dijon) state on their rear labels that they are a "Product of France." If that representation is correct, then the front labels of those products could never be misleading as initially suggested by Culver. Of course, if the "Product of France" designation is incorrect, then Unilever's packaging would indisputably be deceptive in this regard − not because the front label is misleading as to place of origin, but rather because the rear label contains an affirmative falsehood as to a fact.

packaging itself.  *See Colgan v. Leatherman Tool Group, Inc*., 135 Cal. App. 4th 663, 679 (2006) ("In determining whether a statement is misleading under the statute, 'the primary evidence in a false advertising case is the advertising itself.' (*Brockey v. Moore* (2003) 107 Cal. App. 4th 86, 100)"); *Loomis v. Slendertone Distrib., Inc*., 420 F.Supp.3d 1046, 1080 (S.D. Cal. 2019); *see also Bruton v. Gerber Prods. Co*., 703 F. App'x. 468, 471 (9th Cir. 2017) ("The key evidence is the labels.").  That determination is normally made based on the perspective of a reasonable person using the reasonable consumer standard.  *Lavie v. Procter & Gamble Co*., 105 Cal. App. 4th 496, 504-08 (2003).  In that endeavor, one typically considers the entire packaging or label.  *See Bell v. Publix Super Mkts, Inc.,* 982 F.3d 468, 477 (7th Cir. 2020) ("We stand by the general principle that deceptive advertising claims should take into account all the information available to consumers and the context in which that information is provided and used."); *Hesse v. Godiva Chocolatier, Inc.,* 463 F.Supp.3d 453, 462-63 (S.D.N.Y. 2020) ("courts view misleading advertisement claims in light of the context of the whole label or advertisement – 'the entire mosaic should be viewed rather than each tile separately.' *S.C. Johnson & Son, Inc. v. Clorox Co*., 241 F.3d 232, 238 (2d Cir. 2001).").

However, the Ninth Circuit in its oft-cited ruling in *Williams* held that:

> We disagree with the district court that reasonable consumers should be expected to look beyond misleading representations on the front of the box to discover the truth from the ingredient list in small print on the side of the box.  The ingredient list on the side of the box appears to comply with FDA regulations and certainly serves some purpose.  We do not think that the FDA requires an ingredient list so that manufacturers can mislead consumers and then rely on the ingredient list to correct those misinterpretations and provide a shield for liability for the deception.  Instead, reasonable consumers expect that the ingredient list contains more detailed information about the product that confirms other representations on the packaging.

552 F.3d at 939-40.  The Circuit also held that the circumstances in *Williams* did "not amount to the rare situation in which granting a motion to dismiss is appropriate" because:

> there are a number of features of the packaging Gerber used for its Fruit Juice Snacks product which could likely deceive a reasonable consumer.  The product is called "fruit juice snacks" and the packaging pictures a number of different fruits, potentially suggesting (falsely) that those fruits or their juices are contained in the product.  Further, the statement that Fruit Juice Snacks was made with "fruit juice and other all natural ingredients" could easily be interpreted by consumers as a claim that all the ingredients in the product were natural, which appears to be false.  And finally, the claim that Snacks is "just one of a variety of nutritious Gerber Graduates foods and juices that have been specifically designed to help toddlers grow up strong and healthy" adds to the potential deception.

*Id.* at 939.

Many cases which have considered this particular ruling in *Williams* have noted that its holding was premised upon a finding that there were a number of potentially deceptive features prominently placed on the front of the packaging whose effect would not be deemed cured by the mere placement of an ingredient list in small print at the side of the container; and those cases have limited the application of *Williams* where there is not a comparable initial finding of misrepresentation. *See, e.g., Ebner*, 838 F.3d at 966 ("Stated straightforwardly, *Williams* stands for the proposition that if the defendant commits an act of deception, the presence of fine print revealing the truth is insufficient to dispel that deception."); *Dinan v. SanDisk LLC*, No. 18-cv-05420-BLF, 2020 WL 364277, at *9 (N.D. Cal. Jan. 22, 2020) ("the Ninth Circuit has clarified that *Williams* and its progeny speak only to situations in which the defendant has actually committed an act of deception on the front of the package."); *Bush v. Mondelez Int'l, Inc.*, No. 16-cv-02460-RS, *3 (N.D. Cal. Oct. 7, 2016); *Red v. Kraft Foods, Inc.*, No. CV-10–1028–GW(AGRx), 2012 WL 5504011, at *3 (C.D. Cal. Oct. 25. 2012) ("a close reading of *Williams* and its progeny discloses that . . . [it] 'merely bars a defendant from correcting an affirmative misrepresentation on the front packaging through a back of the box ingredient list.'"); *Nelson v. MillerCoors, LLC,* 246 F.Supp.3d 666, 675 (E.D.N.Y. 2017) ("Plaintiff's argument ignores the general rule, articulated by *Williams* and other cases, that disclaimers fail to cure allegedly misleading representations on the front of packaging only where the alleged misrepresentation is clearly stated and the disclaimer is exceedingly vague or requires consumers to make inferences."). Further, many of those cases specifically focus on what is displayed on the front label versus what is also delineated in the rear or side label.

As observed in *Moore v. Mars Petcare US, Inc.,* 966 F.3d 1007, 1017 (9th Cir. 2020), "'[l]iteral truth can sometimes protect a product manufacturer from a misleading claim, but it is no guarantee,' whereas 'there is no protection for literal falseness.' *Brady v. Bayer Corp.*, 26 Cal. App. 5th 1156, [1166] . . . (Ct. App. 2018) . . . . [Q]ualifiers in packaging, usually on the back of a label or in ingredient lists, 'can ameliorate any tendency of the label to mislead.' *Brady*, [26 Cal. App. 5th at 1169]." In *Cheslow v. Ghirardelli Chocolate Co.,* No. 19-cv-07467-PJH, 2020 WL 6342929 (N.D. Cal. Oct. 29, 2020), plaintiffs brought a class action against the defendant asserting that the packaging for its "Ghirardelli's Premium Baking Chips/Classic White Chips" was misleading because the product did not contain any white chocolate whereas Ghirardelli was

famous as a producer of quality chocolates.  In rejecting plaintiffs' argument that the packaging was misleading, that court stated:

> Here, plaintiffs alleged that the brand name "Ghirardelli" as having a particular meaning to consumers, *i.e.*, that it is synonymous with chocolate . . . .  By itself, however, Ghirardelli is not a <u>descriptive</u> brand name in the same way that "One a Day" gummy vitamins or "Prescription Diet" affirmatively communicates something about the product within the brand name itself.  Ghirardelli's product only communicates that it is "Premium Baking Chips" and "Classic White Chips." . . . Nowhere does the front panel of the product affirmatively communicate that it is chocolate.  Indeed, Ghirardelli removed references to "chocolate" from its logo to settle similar litigation involving the company's white chip products. *See Miller v. Ghirardelli Chocolate Co.,* 912 F.Supp.2d 861, 874 (N.D. Cal. 2012) . . . .

*Id.*, at \*4.  The court further stated, relying on the Ninth Circuit's decision in *Moore*, that the back label could be referenced to dispel any confusion:

> Plaintiffs assert that *Moore* holds that ingredient lists cannot cure deceptive front labels.  This is true where the back label conflicts with a front label.  Here, there is no literal falseness on the product's front label so this is not a case where the back label conflicts with any affirmative statement on the front label . . . .  Unlike *Williams*, there is no statement such as "white chocolate chips" next to a picture of white chips.  Without such a conflict, *Moore* holds that a reasonable consumer can review the product's ingredient list to dispel or ameliorate any confusion that might be raised by references to white chips and pictures of white chips on the front label.

*Id.*, at \*5.

Likewise, in *Maeda v. Kennedy Endeavors, Inc.*, 407 F.Supp.3d 953 (D. Haw. 2019), plaintiffs brought a class action as to defendant's Hawaiian snacks products claiming that the front of defendant's packaging − which included the name "Hawaiian" with words associated with Hawaii such as "luau" and "sweet Maui onions" plus images such as Hawaiian leis, hula girls, people dressed in Hawaiian garb – mislead consumers into believing that the products came from Hawaii; when, as indicated on the back of the packages, the snacks were made in Algona, Washington.  The *Maeda* court distinguished the holding in *Williams* and stated that: "Defendant argues that the Washington address is conspicuously placed on the back of the package.  Even if that was not the case, an origination label readily identifies location to correct potential misconceptions about geographic origin, while an ingredient list requires an examination to ascertain whether representations about a product are true." *Id.* at 970 n.8.

### b.  The Labels Here Are Not Deceptive as to Place of Origin

As set out in the Compliant, the only items on the front labels of the Purchased Mustard Products which Culver states are (either individually or in combination) deceptive as to the

products' place of origin are: (1) the word "Paris" and/or a "French address"[18]), (2) a symbol which Culver describes as "a Paris emblem,"[19] (3) the words "Depuis 1747," and (4) the words "Que Maille." *See* Compl. ¶ 36. But the Complaint fails to explain why or how those items would cause a reasonable consumer of mustard condiments to believe that the product was made in France.[20] First, it must be observed that none of those elements cited by Culver expressly indicate where the mustard is made. For example, none say "Made in France," a "Product of France," or even "Imported." Second, there undeniably are words in the French language on the front label, but they are only sporadically used and do not refer to place of origin. Most of the words that serve an informative purpose are in English such as the variety of the mustard (*i.e.* "Traditional Dijon Mustard"), the weight of the product (*i.e.* "Net WT 7.5 OZ (213g)"), nutritional information (*i.e.* "NO added SULFITES"), etc. Third, it must be noted that French is the official language of dozens of countries other than France, including Belgium, Ivory Coast, Luxembourg, Vanuatu and, of course, Canada. Fourth, all of the French words and the emblem on the front label are trademarks or associated with the Maille brand: the emblem is a registered trademark; the words "Que Maille" is part of another registered trademark as are "Maille 1747;" the words "Depuis 1747" translates

---

[18] As noted in footnote 4 and at pages 4-5, *supra*, Culver's claim as to there being a misleading address is incorrect as evidenced by the photograph of the front label of the Maille Traditional Dijon product in paragraph 37 of the Complaint (which shows that there is no address at all on the front label). Further, as indicated in the items in Unilever's initial request for judicial notice (which the Court granted, *see* footnote 10, *supra*), the rear labels for the Purchased Mustard Products all state – next to the designation that the item is a "Product of Canada" – either an address in Englewood Cliffs, New Jersey or that it was "Manufactured for: Amora Maille SI, ZI De La Norge, Chevigny Saint-Sauveur, 21800, Quetigny, France." *See* pages 5-6, *supra*. Therefore, it would be impossible for the addresses on the Purchased Mustard Products' labels to be misleading and/or deceptive as alleged by Culver.

[19] Nothing in the Complaint explains why Culver characterizes the symbol as a "Paris" emblem. As noted above, the emblem apparently references a phrase in French associated with the Maille brand, but Culver never indicates his understanding in regards to the emblem. Moreover, as noted *supra*, the emblem is one of Maille's trademarks.

[20] In his Opposition to the Motion, Culver argues that "Based on the French Representations, Culver reasonably believed the Products were made in France" and only cites to ¶¶ 15-18 of the Complaint. *See* Opp. at 5. Paragraphs 15 and 16 of the Complaint merely describe Culver's buying the Purchased Mustard Products; paragraph 17 delineates what are the "French Representations;" and paragraph 18 merely states the conclusion that "Based on these references to Paris and France and the use of the French language on the labels of the Products purchased, Plaintiff reasonably believed the Products he purchased were made in France." That single threadbare recital is insufficient to establish what a reasonable consumer would believe when presented with the word "Paris" and the Maille registered trademarks which include a few words in the French language. This Court is not required to accept as true legal conclusions couched as factual allegations. *See Iqbal*, 556 U.S. at 678; *Brod*, 927 F.Supp.2d at 828-29. The Complaint fails to allege the fact and the reasons why a reasonable consumer of mustard products would actually believe (rather than merely guess) from the elements on the front label of the Products that they were manufactured in France.

into "since 1747" which references the date when the Maille brand was first started;[21] and "Paris" references the location of the first Maille boutique which was opened in 1747.  *See* Compl. ¶¶ 26-30.  Hence, all of those items serve a purpose to identify the maker of the product – *i.e.* Maille.  The Maille brand name and trademarks are not inherently misleading as to the Products' places of origin.[22]  While the label does include the word "Paris" which is a city in France, it also includes the word "Dijon" which is also a city in France where Dijon mustard first originated (*see* https://www.dictionary.com/browse/dijon-mustard − last visited Jan. 8, 2021) and where Maille still operates a condiments boutique (*see* Compl. ¶ 29).  A mere reference to a geographic location does not imply a location of manufacture.  Culver is not contending that the word "Paris" or the word "Dijon" on the labels is misleading consumers into thinking that the mustards are actually being made in either city.[23]  In sum, the Court finds that the front labels of the Purchased Mustard Products do not contain sufficiently deceptive features as to the place of origin of the condiments.  Hence, the clear designation of the location of where the mustard is made (*i.e.* "Product of Canada") on the rear label is sufficient to dispel any ambiguity that might possibly arise.

      c.   <u>Holdings in Similar Cases</u>

Culver cites to certain cases where the courts have found the front labels of particular products to be sufficiently misleading so as to negate the plain corrective language on the rear

---

[21] Culver argues that the words "Depuis 1747" would mislead consumers into thinking that, because Maille has been making mustards since 1747 originally in France, the Maille mustards are still being manufactured in France, which would be false.  *See* Opp. at 6-7.  That argument fails for a number of reasons.  First, it assumes that the typical reasonable consumer is aware of Maille's prestigious history and its making mustards in France since 1747.  There is no evidence that the reasonable consumer would have that specific knowledge.  While the Complaint describes the history of Maille mustards (*see* Compl. ¶¶ 25-30), it does not allege that a reasonable consumer of mustard products would be aware of that chronicle.  Second, even if the consumer has that specific knowledge, then he or she would have familiarity with the Maille brand to recognize that the "1747" year when placed near the Maille name is one of the brand's trademarks and not a designation of the product's place of origin.  Third, even assuming that the consumer has knowledge of Maille's history, the words "Depuis 1747" is not misleading because Maille still manufactures mustards in France as it has since 1747, it merely also makes mustard condiments in Canada as well.  Finally, in his Complaint, Culver is not limiting his class to consumers who are somehow mislead by their prior knowledge of Maille's mustard production in France.

[22] The present case is not one where the brand name itself is misleading in the context of the product being marketed.  *See Liang v. Bevmo!*, No. B296874, 2020 WL 4461671, at *7 (Cal. Ct. App. Aug. 4, 2020) ("brand names can be misleading in the context of the product being marketed, especially descriptive brand names, when they state or imply something that is false . . . . This case does not involve a brand name that is literally false or misleading.").

[23] *Cf., Forschner Grp., Inc. v. Arrow Trading Co. Inc.*, 30 F.3d 348, 351–355 (2d Cir. 1994) (holding that use of the phrase "Swiss Army" to label knives manufactured in China did not violate false advertising provisions of the Lanham Act, as the phrase was not "geographically descriptive" where the knives were clearly labeled "Made in China").

label.  He also relies on his Survey.  As to the former, none of the referenced decisions are binding on this Court and they are distinguishable.  Further, there are a plethora of other cases, which reach opposite conclusions based on similar facts, which this Court finds more persuasive.

Culver points to the decision in *Hesse v. Godiva Chocolatier, Inc.*, 463 F.Supp.3d 453 (S.D.N.Y. 2020), which held that the words "Belgium 1926" (which was a registered trademark) prominently placed on the front packaging of defendant's chocolates and emphasized in the products' marketing campaign (*e.g.* a representative box additionally had the words "Assorted Belgian Chocolate Caramels") were sufficiently misleading to cause reasonable consumers to believe that the candies were made in Belgium rather than their actual place of manufacture (*i.e.* Reading, Pennsylvania); and, hence, the motion to dismiss was denied.  However, the court in *Hesse* noted that "the reasonableness inquiry takes account of the entire context of a product's labeling" and went on to differentiate the labeling in its situation with those in other cases where there was a disclosure of the actual place of origin somewhere on the packaging.  *Id.* at 468.  *Hesse* is clearly distinguishable from the present lawsuit because; (1) "France" is nowhere mentioned on the front label and (2) all of Unilever's Maille mustard products explicitly state their country of origin.

Culver also cites to *Marty v. Anheuser-Busch Cos., LLC*, 43 F.Supp.3d 1333 (S.D. Fla. 2014), where the court denied a motion to dismiss as to Beck's beer which had been brewed in Germany beginning in 1873 and imported into the United States until 2012, when the defendant thereafter began manufacturing the product in St. Louis, Missouri.  It was held that a reasonable consumer could be misled into believing that the beer was still being brewed in Germany because it was marketed with the following language: "Originated in Germany," "German Quality," and "Brewed under the German Purity Law of 1516."  Further, while labels on the beer and on the cartons did include statements such as "Product of USA, Brauerei Beck & Co., St. Louis, MO.", the trial court examined them and explicitly found that: (1) "the 'Product of USA' disclaimer as printed on the actual cans and bottles themselves is difficult to read;" (2) that disclaimer was blocked when the cans/bottles were in the cartons such that it could not be seen unless the can/bottle was removed from the carton; (3) the words "Brauerei Beck & Co., St. Louis, MO.," was only printed on the "underneath of the carton" such that a consumer would have to look at the underside of the bottom of the carton to see it; and (4) "Brauerei Beck & Co., St. Louis, MO." was held to be an inadequate statement as to where the beer was actually brewed.  *Id.* at 1340-41.  *Marty*

is clearly distinguishable from the present action because: (1) here there are no repeated references to a country on the front label, and (2) this Court finds that the "Product of Canada" disclaimer is clearly displayed on the rear labels.[24]

*Shalikar v. Asahi Beer, U.S.A., Inc.*, No. CV-17–02713-JAK-(JPRx), 2017 WL 9362139 (C.D. Cal. Oct. 16, 2017), involved the sale of beer which was previously brewed in Japan by Asahi Breweries, LTD and imported into the United States but in 2004, pursuant to licensing agreements, was thereafter made in Canada.  The court referenced the following elements of the product's packaging which supposedly created an impression that the product was still brewed in Japan: "(i) the use of English for the 'Asahi' name, which means 'morning sun' in Japanese; (ii) the Japanese Katakana script which means 'Asahi beer'; (iii) the Japanese Katakana script which means 'Super Dry'; and the Japanese Kanji characters which mean 'Karakuchi,' which in Japanese means 'dry taste.'"  *Id.* at *3, *7.  The court also noted that it was undisputed that "[t]he following disclosure appears on the Product's bottleneck label and on the bottom corner of each end of the six-pack carton of the Product: 'BREWED AND BOTTLED UNDER ASAHI'S SUPERVISION BY MOLSON CANADA, TORONTO, CANADA. IMPORTED BY ASAHI BEER U.S.A., INC. TORRANCE, CA PRODUCT OF CANADA.'"  *Id.* at *3.  Nevertheless, the court in *Shalikar* denied the motion to dismiss because it held that: (1) the "'words, pictures, [and] diagrams adorning the packaging' could give rise to a reasonable inference or belief that the Product was produced in Japan"[25] and (2) the effect of the disclosure on the label of the beer that it was brewed and bottled in Canada "cannot be determined as a matter of law."  *Id.* at *8.  Simply stated, this Court would disagree with both conclusions in *Shalikar*.  First, the facts that the product label

---

[24] Culver also cites to *Peacock v. Pabst Brewing Co., LLC*, No. 2:18-cv-00568-TLN-CKD, 2020 WL 5847244 (E.D. Cal. Oct. 1, 2020), which concerned a situation similar to *Marty* involving Olympia Beer which once was brewed in the state of Washington but, after the company was sold to defendant, the original manufacturing plant in Washington was closed and the product thereafter brewed at several mega-breweries throughout the United States. Plaintiff sued claiming that the labels and marketing campaign for the product were misleading because they used the name "The Original Olympia Beer," coupled with the slogan "It's the Water" and an image of a cascading waterfall (a reference to the site of the original brewery) which created the impression that Olympia beer is still brewed in (and with water from) the Olympia area of Washington.  *Peacock* is clearly distinguishable from this case as the contested references are not as geographically-specific and, here, there is a statement as to place of origin because the mustard is designated as a "Product of Canada."

[25] The operative Second Amended Complaint ("SAC") in *Shalikar* contained no reference to pictures or diagrams adorning the packaging.  *See* ECF No. 26 in *Shalikar v. Asahi Beer, U.S.A., Inc.*, No. CV-17–02713-JAK-(JPRx). Moreover, in the only photographs of the bottles and carton of the Asahi beer provided in the SAC (*id.* ¶ 20), aside from a wheat symbol: , there are no pictures or diagrams shown on the packaging.

gives the Asahi name in English and otherwise uses Japanese script for the phrases "morning sun," "Asahi beer," "super dry," and "dry taste" say absolutely nothing about where the beer was brewed. And, in any case, there was no showing that reasonable consumers would be able to recognize (let alone be able to read) Japanese script.  Hence, the first factor boils down to the presence of what appears to be Japanese script on the packaging.  Second, the *Shalikar* decision fails to explain why the disclaimer on the bottleneck labels − which state in English (which presumably a reasonable consumer would be able to read) that the product was brewed and bottled in Canada − would not be sufficient to dispel the consumers' unexplained belief that the beer was made in Japan.[26]  Indeed, it appears that the court in *Shalikar* did what the California and federal courts have said one should not do, namely use a "least sophisticated consumer" as the template for the "reasonable consumer." *See Lavie*, 105 Cal. App. 4th at 504-13.

There are a number of cases with circumstances similar to *Hesse*, *Marty*, *Peacock* and *Shalikar* where the courts issued contrary rulings.  For example, *Bowring v. Sapporo U.S.A., Inc.*, 234 F.Supp.3d 386 (E.D.N.Y. 2017), involved Sapporo Beer originally brewed in Japan since 1877 but, in 1984, the defendant (a related company) was established in the United States.  By the time the lawsuit was filed, all Sapporo Beer sold in the United States was brewed either in Ontario, Canada or in La Cross, Wisconsin.  Plaintiff sued claiming that the defendant was misleading the public that the beer was a Japanese import by means of the following: a "television commercial with imagery of a 'Japanese landscape being traveled into American landscape,' ending with the slogan 'The Original Japanese Beer;' Slogans 'Sapporo − the Original Japanese Beer' and 'Japan's Oldest Brand;' Statement on Defendant's website that 'Sapporo is the original Japanese beer;' Image of the North Star, a 'symbol of pioneers in the area of Sapporo' on labels." *Id.* at 388. Where the beer was brewed in Canada and shipped to the United States, the label included this additional text: "Imported by Sapporo U.S.A. Inc., New York, NY" followed by "Brewed and canned [or bottled] by Sapporo Brewing Company, Guelph, Ontario, Canada." *Id.* at 388-89. Where the beer was made in Wisconsin, the label read: "Brewed and Bottled [or Canned] by Sapporo Brewing Company, La Cross, WI for Sapporo U.S.A., New York NY." *Id.* at 389.  The

---

[26] The court in *Shalikar* noted that the bottleneck label stated in capital letters that the beer was brewed in Canada which was visible when the bottles were still in the carton. *See* 2017 WL 9362139, at *7.  While it observed that the font size of the disclosure was smaller than used for the English text and Japanese script on the bottles' front labels, it did not specifically find that the disclosure would not have been apparent and readable to a reasonable consumer. Further, the court did not explain why the additional disclosure on the carton was insufficient to notify customers that the beer was brewed in Canada.

court reviewed the evidence and materials before it and held: "Considering each allegedly misleading statement and Sapporo's marketing as a whole, the Court concludes that the Defendant's conduct would not mislead a reasonable consumer.  The use of a trademarked star symbol and allusion to the company's historic roots in Japan are eclipsed by the accurate disclosure statement."  *Id.* at 391.  Further, the court found that "Sapporo discloses its product origin in a standalone statement."  *Id.*  The court found that, because the defendant's conduct would not mislead a reasonable consumer, the motion to dismiss would be granted.  *Id.* at 392.  *See* similar rulings in *Nelson v. MillerCoors, LLC*, 246 F.Supp.3d 666, 674-76 (E.D.N.Y. 2017); *Maeda v. Kennedy Endeavors, Inc.*, 407 F.Supp.3d 953 (D. Haw. 2019).

In *Dumas v. Diageo PLC*, No.: 15-cv-1681-BTM-(BLM), 2016 WL 1367511 (S.D. Cal. Apr. 6, 2016), Red Stripe beer was first produced in Jamaica in 1938, imported into the United States beginning in 1985, but in 1993 the defendant brought the controlling shares of the business and moved production of the U.S. supply of Red Stripe from Jamaica to Latrobe, Pennsylvania. *Id.* at *1.  Plaintiffs brought a class action asserting that the defendant's marketing was misleading because: (1) the new packaging "was specifically designed in order to maintain the brand identity of Red Stripe as Jamaican beer," (2) the labels "boldly" state that the product is "Jamaican Style Lager" that contains "the Taste of Jamaica," and (3) the containers display the distinctive "D&G" logo, D&G being the Jamaican brewery where Red Stripe was formerly made.  The court pointed to the fact that the bottom of the packaging stated: "Brewed and bottled by Red Stripe Beer Company Latrobe, PA."  *Id.* at *3.  However, the court went further to find that the terms "Jamaican Style" and "Taste of Jamaica" were used to associate the product with flavors or feelings from the region rather than an indication of a point of origin.  *Id.* at *4 ("A reasonable consumer would not believe that Mexican-style rice is made in Mexico or that Italian-style sauce is imported from Italy.").  Additionally, addressing the issue of consumers who were aware of the beer's prior production in Jamaica but perhaps not having knowledge of its current manufacture in Pennsylvania, it was held that:

> To the extent Plaintiffs complain that representations on the packaging of Red Stripe are not sufficient to alert consumers who already have an understanding and expectation that Red Stripe is brewed in Jamaica that production of the beer has been moved to Pennsylvania, the Court is unaware of any authority supporting the proposition that Defendant would have a heightened duty to counter those pre-conceived notions.  Consumers who used to buy Red Stripe when it was made in Jamaica might very well continue to buy the product without bothering to read the

packaging or labeling under the assumption that it is still brewed in Jamaica. Plaintiffs have not established that Defendant is under a duty to completely change the packaging or include words such as "DOMESTIC" or "local ingredients" to alert such consumers of a change.

*Id.* at *5. *Accord, Nelson*, 246 F.Supp.3d at 675-76 ("the images of a kangaroo and a constellation 'and allusion to the company's historic roots in [Australia] are eclipsed by the accurate disclosure statement.'"). Finally, as to the issue of the language on the front of the container versus the rear or side labels, the court stated:

At any rate, the language on the bottle labels would not lead a reasonable consumer to believe that Red Stripe is made in Jamaica with Jamaican ingredients. Like the packaging of the twelve packs and six packs, the bottle label includes the language "Jamaican Style Lager" under the "Red Stripe" label in addition to the D&G logo. . . . On the back of the label are the words: "For over 80 years . . . Red Stripe has embodied the spirit, rhythm and pulse of Jamaica and its people." This language is a vague, colorful expression of Red Stripe's association with Jamaica and cannot reasonably be construed as a designation of origin. Furthermore, on the edge of the label are the words "Brewed & Bottled by Red Stripe Beer Company Latrobe, PA." Although the words are small, the contrasting white print is legible. It is likely that anyone examining the label carefully enough to read the language on the back of the label would see that the beer is brewed and bottled in Pennsylvania. *See Pernod Ricard USA, LLC v. Bacardi U.S.A., Inc*., 653 F.3d 241, 253 (3d Cir. 2011) (explaining that even if the words "Havana Club" on bottle of rum could be understood as indicating the product's geographic origin in Havana, Cuba, "those same words cannot mislead a reasonable consumer who is told in no uncertain terms that 'Havana Club' is a brand of rum made in Puerto Rico.") . . . .

*Id.*

### d.  The Survey Fails to Salvage Culver's Claims

The Court will now turn to Culver's arguments that: (1) the allegations in the Complaint as to the execution of the Survey and its results are sufficient to establish that the front labels of the Purchased Mustard Products are misleading to reasonable consumers in regards to the mustards' place of origin, and (2) that Survey cannot be challenged at this stage of the proceedings but must be accepted as true. Addressing the latter issue first, in *Becerra v. Dr. Pepper/Seven Up, Inc.*, No. 17-cv-05921-WHO, 2018 WL 3995832 (N.D. Cal. Aug. 21, 2018), the plaintiff brought a class action against defendant claiming that the word "Diet" in the name of defendant's product (*i.e.* "Diet Dr. Pepper") was misleading because the word is understood by consumers as communicating weight loss or at least weight management and the diet ingredient in the soft drink was aspartame which studies had shown is likely to cause weight gain. *Id.* at *1. The district court dismissed an earlier version of the complaint noting that there were no facts or theories in the

pleadings to plausibly support the contention and that, in the court's view, the label merely conveys to the public that the beverage contains relatively less calories and sugar than normal soft drinks. Plaintiff eventually produced a survey of 800 consumers who were asked: "(i) do you expect soft drinks labeled 'diet' to help you lose weight; (ii) do you expect soft drinks labeled 'diet' to help you maintain/not affect your weight; (iii) do you expect soft drinks labeled 'diet' will make you gain weight; or (iv) do you not have an expectation of what 'diet' will do to your weight." *Id.* at *6. About 63.3% of the respondents indicated that they expected a "diet" soft-drink would "help them maintain weight, or at least not affect their weight."  When the defendant challenged the survey, plaintiff cited to the decision in *Shalikar*, 2017 WL 9362139, at *7, for the proposition that "the Court must presume [survey data as] truth on a motion to dismiss, even if a defendant has raised colorable arguments as to the reliability of the survey methodology." *Id.* at *7.  In response, the court stated: "*Shalikar* does not bear the weight *Becerra* puts on it.  In that case, the court found consumer claims were plausible based on allegations about the 'words, pictures, [and] diagrams' on the product's packaging, and not based on the survey alone." *Id.*  After reviewing what was available as to the execution of the survey and its results, the court found the questions posed in it to be inadequate and simply demonstrated the point that "reasonable consumers believe diet soft drinks can lead to weight loss or maintaining weight *relative* to regular soft drinks . . . . the survey's word choice, asking whether drinking diet will 'help' with weight loss or if it will 'make' consumers gain weight, is not as dispositive of a reasonable consumer's beliefs." *Id.* (emphasis in original).  The court held that: "the survey fails to demonstrate a shift in what reasonable consumers would believe when purchasing 'Diet Dr. Pepper.'  It is not a sufficient allegation that reasonable consumers would be misled by the term 'diet.'" *Id.*

On appeal, the Ninth Circuit did not criticize or reverse the district court's treatment of the survey even though the trial judge found its methodology inadequate and the results not to be as characterized by plaintiff.  *See Becerra v. Dr Pepper/Seven Up, Inc.*, 945 F.3d 1225 (9th Cir. 2019).  Instead, the Ninth Circuit stated:

> The survey cannot, on its own, salvage Becerra's claim.  Although we must accept the allegations surrounding the survey as true at this stage of the litigation, a reasonable consumer would still understand "diet" in this context to be a relative claim about the calorie or sugar content of the product.  The survey does not address this understanding or the equally reasonable understanding that consuming low-calorie products will impact one's weight only to the extent that weight loss relies on consuming fewer calories overall.  At bottom, the survey does not shift the

> prevailing reasonable understanding of what reasonable consumers understand the word "diet" to mean or make plausible the allegation that reasonable consumers are misled by the term "diet."

*Id.* at 1231.

There are many other district court cases holding that a barebones or inadequately conducted survey will not be sufficient to establish a plausible reasonable consumer allegation. *See Clark v. Westbrae Natural, Inc.*, No. 20-cv-03221-JSC, 2020 WL 7043879, at *3 (N.D. Cal. Dec. 1, 2020) ("Plaintiff's barebones allegation regarding the results of a 2020 survey which allegedly showed that 69.5% of 400 consumers believed that 'the Vanilla representation on the Product meant that the Product's flavor comes exclusively from the vanilla been [sic] . . . does not push Plaintiff's reasonable consumer allegation over the plausibility line."); *Yu v. Dr. Pepper Snapple Group, Inc.*, No. 18-CV-06664-BLF, 2020 WL 5910071, at *4-5 (N.D. Cal. Oct. 6, 2020). Additionally, in *Cheslow v. Ghirardelli Chocolate Co.*, No. 19-cv-07467-PJH, 2020 WL 6342929 (N.D. Cal. Oct. 29, 2020), on a motion for reconsideration of the grant of a motion to dismiss with prejudice in the consumer class action case, the district court held that it did not commit clear error "by conducting a *Daubert* hearing concerning plaintiffs' consumer survey and then discrediting the survey without actual briefing and discovery." *Id.* at *2. The court went on to state that where the survey is referenced in the complaint and is available to a court for its review, the court accepts the factual averments (but not the legal conclusions or characterizations) as true and can thereafter examine the survey itself. *Id.* at *5-6. In an earlier ruling on the motion to dismiss, the court in *Cheslow* stated:

> The survey itself undermines, rather than supports, plaintiffs' claims. Of course, the court must accept as true all factual allegations in the complaint and attached to the pleadings − this includes the allegations concerning the survey and the survey itself, attached as an exhibit. What's notable about the survey is not what it does allege but what it fails to address. As defendant points out, the survey only showed respondents the front panel of the product. By omitting the back panel, the survey deprived respondents of relevant information, namely the ingredient list. As this court's prior order makes clear, where the defendant does not commit a deceptive act, the reasonable consumer cannot entirely disregard the ingredient list.

*Cheslow v. Ghirardelli Chocolate Co.*, 472 F.Supp.3d 686, 695 (N.D. Cal. 2020).

Turning to the substantive evaluation of the Survey herein, first, as already held, the Court does not find that Unilever's front labels on the Purchase Mustard Products contain sufficiently deceptive elements. As a result, the Court finds that a reasonable consumer would not be free to ignore the available information in the entirety of the products' containers. Hence, if the consumer

had a question as to the place where the mustard was made, he or she would be expected to examine the rear labels of the mustard bottles herein which would inform him or her that the item is a "Product of Canada."  Therefore, as in *Cheslow*, a survey which does not include all of the relevant information cannot be found to establish what a reasonable consumer would believe when confronted with the packaging of the product.

Additionally, the available data would indicate that the Survey was inadequate in its methodology for reasons similar to the ones raised by the district courts in *Becerra*, 2018 WL 3995832, at *7, and in *Cheslow*, 472 F.Supp.3d at 695.[27]  Apparently, the respondents were initially asked certain questions to determine their eligibility to participate in the survey − such as their age, ethnicity, recent purchasing history including whether they bought any mustard product within the past six months.  The respondents were then only shown the front label of the Traditional Dijon product, which is similar to the photograph in paragraph 37 of the Complaint, and asked the following three questions: (1) "What is the first thing that comes to mind when thinking about this product?"; (2) "Are you more likely to purchase products that have the 'Non GMO Project Verified' badge versus those that do not have that badge?"; and (3) "Based on the label of the product, where do you believe the product is made?"  *See* ECF No. 18-1.  Obviously, only the third question really matters to the issues in this case.  But that question is wholly inadequate to provide any meaningful evidence for this case.[28]

Showing a picture of the front label of a mustard container which does not have a place of origin statement on it and then asking the respondent where he or she believes the product is made is essentially asking the respondent to venture a guess based on insufficient information.  At a minimum, there would have to be follow-up questions to make the responses possibly meaningful.  For example, the respondents could be asked how confident they are in their selection and the

---

[27] A complete version of the Survey has not been provided − merely Culver's initial characterization of it (*see* Compl. ¶¶ 6, 41) and Culver's Request for Judicial Notice of what appears to be only a summary of the results of the Survey (*see* ECF No. 18-1).

[28] The exact procedures that were followed in conducting the Survey are unclear.  For example, Culver states that after the third question was a "drop down list of 21 countries, including France, Canada, and the U.S., as well as the option to select 'None of the above' or 'I am not sure.'"  *See* Compl. ¶ 6.  The Survey results provided to the Court contains a list of 21 countries (plus the "None of the above" or "I am not sure" responses) where the countries and/or responses are not placed in a neutral fashion (such as in alphabetical order).  Rather, placement appears to be non-random as the first two countries listed are the United States of America and France (which unsurprisingly received the highest number of hits), while Canada was placed almost at the bottom of the list.

reasons for their selection.[29]   Conversely, the question could be rephrased in any number of ways to provide more relevant answers.  For example, the question could be formulated as "if you wanted to buy a mustard that was made in France, would this front label provide you with enough information for you to believe that the mustard contained in the bottle was made in France?  And, if so, why?  And, if not, why?"

Further, there is no showing that the respondents taking the Survey are a proper representative sample for determining what a reasonable consumer would do or believe in the given situation.[30]   For example, Complaint asserts that the labels are misleading in regards to whether the mustards are made in France.  Therefore, presumably, the respondents participating in the survey should be persons who are desirous of purchasing mustards made in France, not simply any consumers of food products or merely persons who may have purchased mustards in the past.  A preliminary question could have been: Is the location where a mustard is manufactured a significant factor in your decision to purchase a particular brand of mustard?

In sum, the barebones/inadequately conducted Survey does not push Culver's reasonable consumer allegation over the plausibility line.

C.  Culver's Motion to Strike Unilever's References to the Survey

Culver also moved to strike portions of Unilever's Reply that referred to the Survey, arguing that they were used in arguments raised improperly for the first time in the Reply.  Alternatively, Culver asked this Court for leave to file a sur-reply.  *See* MTS.

As noted *supra*, the Complaint specifically cited to the Survey, making representations as to what it was and partially how it was executed, and referencing its results.  *See* Complaint ¶¶ 6, 41.  Unilever has requested that this Court take judicial notice of the Survey and attached a copy of it in its Reply.  Culver does not assert that the attached document is not an accurate copy of the Survey results.  While Unilever did not raise the Survey in its Motion, Culver repeatedly utilized it in his Opposition.  Hence, Unilever could properly address those contentions in its Reply and

---

[29] For example, if a respondent states that he or she is not sure at all in his or her answer, then that response should not be counted.  Also, by asking the respondents why they chose their particular answer would also provide some necessary information to validate the Survey.  For example, if a respondent says she picked France because she believes that all Dijon mustards are made in France, then her response would have to be thrown out.

[30] According to the Survey results, less than half of the respondents (*i.e.* 49.5%) had purchased any mustard product within six months of participating in the inquiry.  *See* ECF No. 18-1 at page 8 of 14.  It is therefore questionable whether the respondents would be an appropriate "target population."  Presumably, some familiarity with mustards and purchasing mustards would be di minimis requirements for a properly conducted survey.

use the Survey in doing so.  Therefore, the Court will take judicial notice of the Survey, over Culver's objections, since it can properly do so under Federal Rule of Evidence 201.  *See United States ex rel. Lee v. Corinthian Colleges*, 655 F.3d 984, 999 (9th Cir. 2011) (a document not attached to a complaint may nevertheless be considered on a motion to dismiss if: "(1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the document.").

Because the Court is only taking judicial notice of what the Survey states on its face and given the fact that the Court is granting the motion to dismiss with leave to amend, the Court denies Culver's request to file a sur-reply.

## V.  Conclusion

Based on the foregoing discussion, the Court **GRANTS** Unilever's motion to dismiss but without prejudice, and **DENIES** Culver's motion to strike the portions of Unilever's Reply or to give it an opportunity to file a sur-reply.  In the amended complaint, the Court would allow Culver to include a detailed offer of proof as to the new proposed survey which he stated he would execute based on the amended pleading.